All right, our final case for today is Turner v. Paul. Mr. Foxx. Good afternoon, Your Honors. Ed Foxx for the Plaintiff Appellants. This case is here from the granting of a summary judgment on behalf of all the defendants. This is a Section 1983 case in connection with the failure to obtain medical treatment for an inmate at the Cook County Department of Corrections. The primary issue that it's here on is, and the basis for the district court's decision, was that the court decided that we hadn't shown the personal participation of the defendants in the care of the plaintiff in order to establish liability on their behalf. And just briefly, this was a patient who needed to get referred from Cook County Jail for a fractured nose he obtained at the jail. He needed to get deferred to Stroger in order to get the surgery. The surgery was getting scheduled, but then was canceled several times. The defense was, Stroger did this, Stroger's the only one that could do the surgery, not Cook County Hospital, or not Cook County Jail, so therefore the doctors and the staff at Cook County Jail bear no responsibility for what happened. What do you think they should have done, since this record seems pretty clear that it's, I was a little surprised about this, but it's the medical residents at Stroger who controlled the scheduling? Right. Well. But what do you think these defendants should have done that they did not do? So, these defendants have the responsibility for initiating the process to get him over to Stroger. And they did, several times, as far as I can tell. They did several times. And he did get scheduled, and then roughly three times for surgery, it's a little unclear, but roughly three times for surgery he got scheduled, and the surgery gets canceled. But if they were monitoring his care as they have a duty to do, because he's an inmate at the Cook County Jail, if he doesn't get the surgery and goes back to the jail without getting the surgery, they have the obligation then to do one of several options they had. Either call the Stroger Hospital, talk to the scheduler, which they have the option of doing, talk to the surgeon, which they have the option of doing, or just send him over to the plastics clinic, the specialty clinic over there, so he can get pre-op clearance, and then go through the process. And they just didn't do that enough. They did it a couple of times, but then they didn't do it on many times. So, he got scheduled for surgery, it looks like he got scheduled for pre-op once in December, then it went over to, he didn't get, he didn't, wasn't scheduled for surgery again until late February, and when that surgery, February 26th, when that surgery got canceled, he gets sent back to Cook County Jail. And then again, the last time was March 31st, he got scheduled, and then that didn't happen. So there was several times, and a lot of delay ensued in between those times. So, the plaintiff in this case, he filed roughly 25 health service request forms and or grievances in connection with requesting medical services for his care, or just grieving the fact that he was in pain and he needed care. And then it got to the point where the criminal court judge that was seeing his criminal case gave two orders that related to getting him care, and in the course of getting the two orders, they would go, it was a channel they went through, and there was no follow-up. So, let me ask you about the state court judge's participation, because it, I got the impression reading this sequence that he wasn't entirely forthcoming with the state court judge about the care he was getting, at least, at the jail. Granted, he doesn't get the surgery, the rhinoplasty surgery, until actually after he's out of the jail, but it sounds like the court judge himself, nobody was doing anything. Well, I think that the, I don't think he was the most articulate individual in the world. For example, he said, there's a bone protruding through my eye, and he's standing in front of the judge. Obviously, there was no bone protruding through his eye. He was told that the bone was misplaced near his eye, and that's what he says. So, he said a couple of things that weren't precisely accurate. On the other hand, he did clearly say, look, I'm told I'm The judge did exactly, I think, what the judge should have done. He says, look, get him the surgery if he needs surgery, because, of course, the judge can't say he needs surgery. So, these court orders would happen. They would go through this process of this Sandra Navarro, who's supposed to deal with court orders, and they would go to this Dr. Manella, who's in charge of continuity of care. She was the policymaker. And then, the primary care physicians might take a look at it, but then there'd be no follow-up to see that he got the care. Doesn't the record show, in terms of the availability of a surgical slot over at Stroger, that there was some triage going on that you might get slotted, but if somebody decided that a more urgent case was in, you would get bumped? So, the defendants kept referring to a balancing test in their Rule 56 statement. In the record, there's no balancing test that ever comes up. And there was some concerns with, in one instance, there was an inference or an implication that he got bumped one time because of that issue. And sure, that's a possibility. And if that happens... And wasn't there one doctor in this record who was of the opinion that there's such swelling after the original injury that you really needed to wait about six months before you should attempt reconstructive surgery? Sure. And that opinion was never expressed in a medical record. It was first made in depositions after the fact. And this is by the same doctor that indicated that he needed surgery back in November. This incident, the broken nose, happened in October. The incident happened... Dr. Sherba? Dr. Sherba. He indicated, and his residents scheduled him. He and his residents were scheduling him for surgery far before the six-month time period. So, I think we can... And then, both experts, even the defendants' expert, said he was a candidate for surgery beginning in January, which would have been less than four months post the incident. So, I don't believe that... Well, at the very least, that's a credibility issue because of the inconsistency in what he did versus the medical record itself. The other thing I want to... Each of these doctors that saw him, the primary care physicians, they have the obligation to deal with him. Plaintiff's care is under the Department of Corrections. They're responsible for his care. The doctors represent the Department of Corrections. So, what about the administrators? Usually, in cases like this, administrators are entitled to rely on what the medical people are doing. So, they are entitled to rely on what the medical people are doing, but the medical people weren't doing enough. They have to... If he gets referred, they refer him one time over and they send him right back, then they've got to make sure he gets sent back over again, not just let him fall through the cracks, because this would fall through the cracks until either there was a judge, a court order, or he made some more health service requests or grievances. Tell me about your... You have kept alive on appeal the question of the county's possible liability under the Monell Doctrine. What's the basis for that? I'm glad you asked because one thing we did overlook in our brief was a case called Hampton v. Hart. It was a case decided by Judge St. Even when she was a district court judge. It dealt with this precise issue. With the county jail, a guy had an Achilles tear at the county jail and needed surgery. The surgery was to be done at Stroger Hospital, and Stroger Hospital delayed and delayed and delayed and didn't get it. The defense was exactly identical to the defense here. The people at the county jail don't do surgeries. So, she dealt with that in the context of a Monell liability because it was a pro se inmate that did the case, and he didn't name the doctors at the county jail. What Judge St. Eve did in that case was, and I'll just tell you, she says, the official capacity defendants cannot delegate responsibility of care to Stroger Hospital and, quote, excuse itself from ensuring that the medical needs of inmates are met. A division of labor must ensure that jail officials fulfill their responsibility to provide constitutionally adequate care to each individual maintenance inmate with reference to his particularized medical need. And she noted that the responsibility for securing medical care for the prisoners rests with the county jail. So, merely referring them out to somewhere else does not insulate or excuse their conduct. So, in connection with, in that case, in connection with Monell liability, which is to get to your particular question, is two points. One is, in that case, there was multiple, multiple continuous complaints and grievances or requests by the inmates, just like here, and she said that's enough to create the possibility, it's a fact question, whether there's a widespread custom that caused what happened. The second point about that, which wasn't at issue in that case but is in this case, is one of the defendants, Dr. Monella here, is a policymaker. And Dr. Monella was personally involved with trying to oversee care, except that she never did the follow-up. But she was personally involved, and she didn't make it happen. And she was, her job was the continuative care for detainees and scheduling. That was her job, and she was the policymaker, as I said. Dr. Monella had personal knowledge of the plaintiff, beginning with the first note from the judge, and that was at the beginning of November, which was early on, a month after the incident. And then in early February of 2016, this is after the inmate's attorney, then a criminal attorney, he called Sandra Navarro, who handles some of these issues for the county, called her about the need for surgery. In fact, this is the second time he's now getting involved. And at Sandra Navarro's direction, Dr. Monella and Dr. Friedman, again, researched the record, the medical record for Mr. Turner, realized he's been scheduled multiple times for surgery, realized he's not getting it, and then they note that he needs the rhinoplasty surgery, and they failed to do a follow-up on that. So he gets scheduled for a surgery after that time, February 26th. It doesn't happen February 26th. And that's almost a month later. He gets scheduled for rhinoplasty surgery again a month later, March 31st. It doesn't happen again on March 31st. When did the state judges get into the act? He got in very early on in November of 2015, and then again one time in 2015 and one time in 2016. So you've got this kind of chronic, on the part of the administrators at least, there's just a chronic attitude of let's bear with it. That seems to be what happened. It fell through the cracks on multiple occasions. And the fact that this guy was pretty vocal about grieving this. He had a bunch of residents who were just kind of kicking the can down the road. Exactly. And Dr. Scherba was the surgeon who kicked the can along with them. And maybe they had more person who should have gone to somebody higher up. I'm sorry? Who is the person who should have gone to somebody higher up? Well, there's Dr. Fellman who supervised all the physicians at the county jail. So she could have gotten on the phone and talked with the surgeon over there or talked with the scheduler or made more appointments with the plastic surgery clinic. And there's Dr. Minella who was the continuity of care person at the county jail who's supposed to monitor the continuation of care. And she's on this case. She's aware of it. So they're all living in a world of possibles. They're all saying, in effect, well, I can do just so much. Apparently, and I can't read their minds, but that's what I agree with you. A reasonable juror could decide that. A reasonable juror could decide that, exactly. And whether or not that would meet the requirement of objective reasonableness or not would be something a jury could decide. Well, it's a chronic bureaucratic mentality of enough's enough, good enough for county work. That's what a jury would be able to decide. And that's what a jury should decide, actually, in this case. So I see my time's up, so with that I'll. All right. Thank you, Mr. Fox. Mr. Reagan. Mr. Reagan, let me give you just a square opportunity to answer that. You do get the sense in this record that basically the county of people took the position, this is good enough for county work. He's not getting the surgery. We're all passing the paper around. Good enough. Believe it. You really do get that impression here that nobody really cared whether this guy got the surgery. Well, one thing I would disagree with that is you can look to plaintiff's own expert. His name is Dr. John McMahon. He was retained by Mr. Turner to put forth opinions about Cook County and about all the individual named defendants. What he put in his disclosure were conclusory opinions about these individual named defendants and about Cook County. But when he was deposed, he retracted each and every opinion against the individually named defendants and Cook County. And so if we're talking about what a physician did, whether they were objectively reasonable, how can a jury determine that a physician acted reasonable or not reasonable without expert testimony? And their own expert said that he did not find that the Cook County deviated from the standard of care. I think what's important to know here, and by the way, sorry, I did not get to introduce myself. My name is Bill Reagan. I represent Drs. Richardson, Paul, Minnella, Sandy Navarro, Gina Chung, and Dr. Feldman. You represent the county too? I represent Cook County as well, yes. There's a couple of misrepresentations of the records that Mr. Fox made that I'd like to clear up. He said that Dr. Sherba only at deposition said what he implied was that during deposition, Dr. Sherba said that he wanted to do the surgery within 6 to 12 months, which is true. He did say that at deposition. He said there's no corroborating evidence from the time frame of when he was treating him that suggested anything like that, and I challenge that. The January 19, 2016 note drafted by Dr. Sherba says, Dr. Garth, the resident, says, let's take this guy to surgery soon. He said, no, let's take him to surgery when the OR is available. This suggests that Dr. Sherba only thought of this, you know, that it's not, that it's an elective procedure. It doesn't need to be done at any specific time frame at deposition. It's belied by the record. Secondarily, he talked about the judge's orders, and he said that there was a judge for an order that was passed along to the individual defendants in 2016. Again, he was incorrect. The first order was November 9, 2015. The second order was September 14, 2015. And his own expert said that surgery, it was appropriate to not do this surgery because after you get hit in the nose as hard as Mr. Turner did, the swelling has to come down. And by January 6, mid-time, it was appropriate, and they should have waited until the middle of January 2016 to perform this surgery. But, of course, it doesn't happen until November. There's still a long wait. That's correct. It doesn't happen until November. And that's not, no thanks to Cook County, actually. It's because he's out, and he can take care of it himself. I would disagree. I think it's exactly thanks to Cook County because he left Cook County's, the Cook County Department of Corrections on around June 2016. He went to Illinois Department of Corrections for a number of months. So it's Stateville, right? I think it's Stateville, yeah. He was there for a number of months. When he left, and he could go to any hospital he wanted to go to. He had been to Northwestern in the past. He'd been to other hospitals. He chose to go back to Cook County, and that's where he got his procedure. So to say that Cook County did nothing in this case and didn't provide him the surgery, that's inaccurate. And Mr. Turner willfully came back to Cook County for the surgery. To Stroger, I assume, yeah. Correct. I mean, that could be money, right? Stroger being the Cook County Hospital. Pardon me? It doesn't matter. That's beside the point. The district court appropriately found that there is no evidence that any of these individual defendants acted unreasonably. I think it's important to know this is not like taking off a mole. This is a septoplasty and turbinate reduction. Turbinates are bones within the sinus that need to be shaved and reduced. It is a risky procedure. It's done commonly, but there are complications. The only people who are credentialed and could perform this sort of surgery are Dr. Sherba and Dr. Gardner. They are not defendants in this case. Dr. Richardson, Dr. Paul, Dr. Feldman, and Dr. Manella are internal medicine physicians. They cannot go to Stroger and perform the surgery. They cannot recommend the surgery be performed. They can only send a patient over to the clinic where those doctors, those specialists, can determine whether the surgery is indicated and when it should be performed. But it's repeatedly identified as indicated, and it's repeatedly scheduled, and then it drops off. And that is due to the specialty clinic. Their own expert says that he does not have any standard of care. They're not defendants in this case, but even if they were, their own expert said that their care, he can't say it's a deviation from the standard of care. Each and every time Mr. Turney says, hey, I need this surgery done, each and every time you look at the record, the CIRMAC health services physicians and administrators get him over to the specialty clinic at Stroger, and that's all they could do. There's testimony by Dr. Gardner that says that if there was a call placed by someone to say, we need to do the surgery right away, he would take that in kind. But they can't schedule the surgery. The plaintiff's expert, Dr. McMahon, said that if such a situation occurred, he's at Northwestern, and if someone called him and said, hey, there's this guy who has an elective surgery, he's got a deviated septum, who would benefit from better breathing, I need you to get the surgery done, I need you to get it within two weeks, he said he would call Northwestern's hospital administrator and say, that person needs to be fired because it's an inappropriate way to treat a specialist. In this case, going to your, the Monell claim, I think it's important to know that there are, he has no extrinsic evidence of the policies affecting any other individuals. In order to prevail in Monell, you need to show that it's a widespread practice affecting a large number of people. In this case, all he's done is argued that he individually was getting kicked from the Cook County Stroger Hospital specialty clinic call. And there's no evidence to suggest that any other individual was kicked off of that call. We do have some process evidence that it's the medical residents over at Stroger who hold the keys to the schedule, right? That's correct. And they are a level one trauma unit. So from time to time, they'll have, let's just say, you know, three to four schedules, surgery schedule. And they'll know there's going to be a number of surgeries that get on their case because someone gets shot in the face or breaks their orbital bone or something else that emergently needs to get done. And those elective surgeries, whether they're people that are detained or whether they're people that are free in the public world, those surgeries get kicked. And I think it's important to know, to determine whether that's objectively reasonable, they have their own ENT who was hired by them who did not make that conclusion. In order to prevail a trial, plaintiff would have to ______. In this case, I think, Judge Wood, you appropriately started there. Whenever this issue was brought to any of the individually named defendants' attention, they promptly and quickly made sure that Mr. Turner was seen at Stroger. And, in fact, he was seen at Stroger. Just because they weren't trained to perform terminate reduction encephaloplasties and that they didn't have the OR time to perform terminate reduction encephaloplasties, they should not be held responsible. All right. Thank you very much, Mr. Reagan. You used up your time, Mr. Fox, but I'll give you one last minute. Just a couple of points, then. With regard to the expert testimony, our expert, Dr. McMahon, testified that it would have been appropriate to give him the surgery any time beginning in January of 2016, as did their expert. He could not testify who was responsible for failing to do that because he's not in the Cook County Jail. That's not his expertise. So that's why he didn't do that. The second point is, with regard to getting the surgery, finally, after he was released, he did go back to Stroger, and on his own, in less than a month, he was able to get the surgery. He went in there, I think it was November 8th, and by November 26th, on his own he was able to get the surgery. So it certainly suggests, if you want to do it, they can make it happen. And then, finally, with regard to the Monell liability issues, there was a policymaker that was admitted by the defendants, Dr. Manella, and as policymaker, she speaks for the county. So her failure to get it done, she's the continuity of care policymaker. Her failure to get it done speaks for the county, and there should be at least a jury question of whether it was objectively reasonable. Thank you. All right, thank you. Thanks to both counsel. We'll take the case under advisement, and the court will be in recess. Thank you.  Because I figured, of all the people, he'll know, right?